**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| **Awad Odeh** and **Julia Salameh**, | Bankruptcy No. 23-5875 |
| Debtors. | Honorable David D. Cleary |
| **Awad Odeh** and **Julia Salameh**, | |
| Plaintiffs, | |
| v. | Adversary No. 23-130 |
| **Ahmad Zahdan**, | |
| Defendant. | |

**DEBTORS' STATEMENT OF FACTS IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

**1. Odeh agrees to take on his brother's debt, but he does not get anything in return for doing so.**

1. Awad Odeh, Julia Salameh, and Ahmad Zahdan are part of a close-knit Palestinian community in Chicago's south suburbs. Answer (attached as Ex. 1), at ¶ 6.

2. In 2019, Odeh's brother, Ehab, was in the business of scrapping gold, which he ran under the company North American Refinery NAR Inc. A. Odeh Decl. (attached as Ex. 2), at ¶ 3.

3. Odeh did not have knowledge at the time about Ehab's specific transactions with Zahdan, described below. Ex. 2, at ¶ 4.

4. Instead, Odeh's brother, Ehab, was running the business and dealt with Zahdan. Ex. 2, at ¶ 5.

5. Salameh was never involved in the business in any way, and she did not learn of the transactions described below until after Zahdan obtained his judgment against her. J. Salameh Decl. (attached as Ex. 3), at ¶¶ 3–4.

6. At Ehab's request, on February 1, 2019, Zahdan and his company AZ SPE LLC invested $500,000 in North American Refinery, and North American Refinery was obligated to pay back this investment by August 1, 2019. Ex. 1, at ¶ 9.

7. On July 15, 2019, Zahdan added another $685,000 to the investment as a loan from "Ahmad Zahdan of AZ SPE, LLC to North American Refinery, NAR" to be repaid by August 15, 2019. Ex. 1, at ¶ 10.

8. North American Refinery repaid Zahdan some of the funds he had advanced, leaving a balance due of $838,000. Ex. 2, at ¶ 6.

9. North American Refinery was unable to repay the entire amount, so Zahdan attempted to hold Ehab personally liable. Ex. 2, at ¶ 7.

10. Ehab could not pay the amount due either, so Zahdan asked Odeh to sign a promissory note for the amount owed. Ex. 2, at ¶ 8.

11. In Palestinian culture, it is common for individuals to assume debts that their family members cannot pay. Ex. 1, ¶ 14; Ex. 2, at ¶ 9.

12. Odeh did not receive, nor did he benefit in any way from, any of the funds that Zahdan advanced to North American Refinery. Ex. 2, at ¶ 10.

13. Solely to help his brother, Odeh eventually agreed to pay North American Refinery's and Ehab's debt and offered as collateral various properties in which he had a direct or indirect interest. Ex. 2, at ¶ 11.

14. Zahdan had his lawyer draft a document granting a security interest that listed several properties that Odeh and his wife, Salameh, had an interest in. Ex. 1, ¶ 17; Ex. 2, at ¶ 12.

15. In September 2019, Zahdan met with Odeh, presented the security instrument, and asked Odeh to circle the properties that Zahdan could lien. Ex. 2, at ¶ 13.

16. Those properties were:

      a. 1529 S. Pulaski Rd., Chicago, IL 60623 (owned by Reliant Asset Corp., which is owned by Odeh);

      b. 515-517 W. 75th St., Chicago, IL 60623 (owned by Reliant Asset Corp.);

      c. 10685 Granada Ct., Palos Hills, IL 60465 (owned by Salameh); and

      d. 13711 Springfield Ave., Robbins, IL 60472 (owned by Odeh).

Ex. 2, at ¶ 14.

17. Because some of these properties were owned by Salameh or Reliant—and even though Salameh and Reliant had nothing to do with any of this—Zahdan insisted that Salameh and Reliant, too, assume North American Refinery's debt. Ex. 2, at ¶ 15.

18. Zahdan also prepared a promissory note and security agreement, dated September 9, 2019, obligating Odeh, Salameh, and Reliant to pay Zahdan $900,000 on or before September 23, 2019. Ex. 1, at ¶ 20; Ex. 2, at ¶ 16; Recorded Security Interest and Promissory Note (attached as Ex. 4), at 12–15.

19. After the documents were notarized, Zahdan recorded them. Ex. 2, at ¶ 17.

## 2. Odeh and Salameh cannot pay the debt in full, although family members pay some money towards the debt.

20. Odeh and Salameh were not able to pay the debt by September 23, 2019, but Odeh continued to work with Zahdan to find ways to resolve the debt. Ex. 2, at ¶ 18.

21. In December 2019, Zahdan contacted Fadi Sahouri, Odeh's brother-in-law, and asked him to act as an intermediary or mediator to help the parties negotiate a resolution. Ex. 1, at ¶ 33.

22. In Palestinian culture, when two parties agree to involve a mediator, both sides are also agreeing to abide by any ruling the mediator issues. Ex. 1, at ¶ 34; Ex. 2, at ¶ 19.

—3—

23. Sahouri agreed to act as a mediator and met with Zahdan personally in December 2019. Ex. 1, at ¶ 35.

24. Throughout 2020, 2021, and 2022, Sahouri continued to try to help the parties settle the matter. Ex. 2, at ¶ 20.

25. In December 2020, Zahdan agreed to accept a $100,000 payment. Ex. 1, at ¶ 37.

26. On December 29, 2020, Zahdan, Waleed Kisswani (Zahdan's business partner), and Sahouri met to exchange the $100,000 payment. Ex. 1, at ¶ 38.

27. Sahouri delivered $100,000 in cash to Zahdan on Odeh's and Salameh's behalf, and the parties counted the cash together. Ex. 1, at ¶ 39.

28. Later, Zahdan demanded additional funds, and Sahouri started making $5,000 monthly payments on Odeh and Salameh's behalf, beginning in July 2021. Ex. 1, at ¶ 40.

29. Sahouri caused Darna Furniture, a company of his, to make four monthly payments—on July 7, August 11, September 13, and around October 15, 2021—on Odeh's and Salameh's behalf towards the balance Odeh and Salameh purportedly owed to Zahdan. Ex. 1, at ¶ 41.

30. Zahdan received the checks, endorsed them, and deposited them in his bank account at First Midwest Bank. Ex. 1, at ¶ 42.

### 3. Zahdan sues Odeh and Salameh even though they were actively making payments.

31. On March 25, 2021, despite the fact that he had just received $100,000, and despite the impending start of the monthly $5,000 payments, Zahdan sued Odeh and Salameh in state court. Ex. 1, at ¶ 43; Ex. 2, at ¶ 21.

32. Instead, Zahdan sought in his complaint the full, uncorrected, nominal amount under the September 2019 note—$900,000—from both Odeh and Salameh. Ex. 1, at ¶ 46; Compl. (attached as Ex. 5).

33. Eventually, on August 6, 2021, Zahdan obtained a default judgment against Odeh and Salameh. Ex. 1, at ¶ 47.

34. Odeh retained a lawyer to represent Odeh and Salameh in the suit. Ex. 1, at ¶ 48.

35. The lawyer filed a motion to vacate the default judgment. Ex. 1, at ¶ 49.

36. That motion was granted, but for unknown reasons, the lawyer never filed a response to Zahdan's complaint. Ex. 2, at ¶ 23.

37. As a result, default judgment was entered against Odeh and Salameh again on October 1, 2021. Ex. 1, at ¶ 51.

38. The lawyer sought to vacate the second default judgment, too, but that was apparently denied (although no order appears on the docket). Ex. 1, at ¶ 52.

39. The lawyer never presented any substantive defense to Zahdan's complaint—including the facts that the amount owed to Zahdan was $182,000 less than what Zahdan was seeking in his complaint, that Odeh and Salameh had not received any consideration for undertaking the obligation to Zahdan, and that Salameh never signed or authorized anyone to sign Zahdan's note and security agreement. Ex. 1, at ¶ 53; Ex. 2, at ¶ 24.

40. After obtaining his default judgment, Zahdan aggressively pursued collection through various legal proceedings. Ex. 1, at ¶ 54.

41. For example, Zahdan issued citations to discover assets to Odeh, Salameh, their business, and their banks. Ex. 1, at ¶ 55.

42. Zahdan recorded his judgment in an attempt to obtain a judgment lien on a parcel of real estate that Salameh owned: 9937 S. 88th Avenue in Palos Hills, Illinois. Ex. 1, at ¶ 56; Recorded Judgment (attached as Ex. 6).

43. Zahdan attempted to levy or otherwise foreclose his supposed liens on Salameh's real estate, including Odeh's and Salameh's home. Ex. 1, at ¶ 57.

44. Zahdan sought the turnover of Odeh's stock in an auto rebuilding business Odeh owns. Ex. 1, at ¶ 58.

45. Zahdan obtained wage deductions from Odeh's and Salameh's employers. Ex. 1, at ¶ 59.

46. Zahdan seized funds in financial accounts owned by Odeh and Salameh. Ex. 1, at ¶ 60.

47. Zahdan received at least $38,000 from Odeh and Salameh through his post-judgment collection efforts. Ex. 1, at ¶ 61.

**4. Zahdan seeks post-judgment mediation at the local mosque.**

48. Meanwhile, in July 2022, Zahdan requested that Sahouri attend a mediation at the local mosque, the Mosque Foundation at 7360 W. 93rd Street, Bridgeview, IL 60455. Ex. 1, at ¶ 62.

49. The mosque offers mediation and arbitration services to its community members to resolve disputes and preserve relations between the disputants. Ex. 1, at ¶ 63.

50. In such mediations, the parties agree to submit their cases to a mediation committee and to be bound by the committee's decision. Ex. 1, at ¶ 64; Ex. 2, at ¶ 26.

51. Sahouri agreed to attend the mediation, and the mediation took place on August 2, 2022. Ex. 1, at ¶ 65.

52. Sahouri was present, as was Zahdan, Waleed Kisswani (Zahdan's business partner), and the four members of the mosque's mediation committee: the imam, Sh. Jamal Said, as well as Khalil Khalil, Saad Malley, and Abdelhameed Abughoush. Ex. 1, at ¶ 66.

53. After the mediation, Sahouri made two more monthly payments of $5,000 to Zahdan on Odeh's and Salameh's behalf. Ex. 1, at ¶ 68.

**5. Odeh and Salameh file a chapter 11 bankruptcy case.**

54. On May 3, 2023, (the "Petition Date") Odeh and Salameh filed a case under subchapter V of chapter 11 of the Bankruptcy Code. Ex. 1, at ¶ 69.

55. That case remains pending before the United States Bankruptcy Court for the Northern District of Illinois as case no. 23-5875. Ex. 2, at ¶ 28.

56. Odeh and Salameh remain in possession of their assets and serve as the debtors-in-possession for their bankruptcy estates. Ex. 1, at ¶ 70; Ex. 2, at ¶ 29.

**6. Odeh and Salameh have creditors whose unsecured claims arose before Zahdan's obligation was incurred.**

57. Odeh owed a debt to the City of Chicago on the date he filed for bankruptcy. Bankruptcy Schedules (attached as Ex. 7), at 29.

58. The City filed a proof of claim identifying unsecured claims that arose in 2005 or earlier, before Zahdan's transaction. City of Chi. Proof of Claim (attached as Ex. 8).

59. Similarly, Salameh owed an unsecured debt to Salle Mae Inc. on the date she filed for bankruptcy. Ex. 7, at 45.

60. Salameh incurred this student loan debt beginning in January 2016, before Zahdan's transaction. Ex. 7, at 45.

**7. Odeh and Salameh became insolvent as a result of Zahdan's obligation.**

61. On May 24, 2023, Odeh and Salameh filed their schedules and statements, disclosing among other things their assets and secured debts as of the Petition Date.

62. During this bankruptcy case, in lieu of pursuing an avoidance action, Salameh entered into a settlement with Ehab Odeh that resulted in her estate regaining its interest in real estate located at 9937 S. 88th Ave., Palos Hills, Illinois. Settlement Agreement (attached as Ex. 9); Recorded Deed (attached as Ex. 10)

63. Including Salameh's estimate of value of the 88th Avenue property, and disregarding Zahdan's asserted liens, Odeh and Salameh's "assets" under the Uniform Fraudulent Transfer Act totaled just $131,565.56 on the Petition Date:

|  |  |
|---|---|
| Total value: | $1,012,007.45 |
| Less liens: | $835,721.04 |
| Less exemptions: | $57,446.86 |
| *"Asset" value for UFTA purposes:[1]* | *$131,565.56* |

Ex. 7, at 3–22; Summary of Debtors' Schedules (attached as Ex. 11).

64. Zahdan asserts that his claim against Odeh and Salameh was $1,163,526.59 on the Petition Date. Zahdan Proof of Claim (attached as Ex. 12).

65. Between September 9, 2019, and the Petition Date, neither Odeh nor Salameh acquired or disposed of any property that would have had any material effect on the value of their "assets" as defined by the Uniform Fraudulent Transfer Act. Ex. 2, at ¶ 30; Ex. 3, at ¶ 6.

66. With the exception of the 88th Avenue property, which has been recovered, they did not acquire or dispose of any individual item of property whose "asset" value was more than $10,000. Ex. 2, at ¶ 31; Ex. 3, at ¶ 7.

67. Nor did they acquire or dispose of property whose collective "asset" value approached the $768,434.44 or more that would have been needed to make them solvent if they had no other unsecured debts but Zahdan's, much less the additional "asset" value that would have been needed to cover their other unsecured debts. Ex. 2, at ¶ 32; Ex. 3, at ¶ 8.

68. Therefore, before incurring the obligation to Zahdan, Odeh and Salameh's had about $131,000 in equity in their property. Ex. 7, at 3–22; Ex. 11; Ex. 2, at ¶¶ 30–32; Ex. 3, at ¶¶ 6–8.

69. As a result of the obligation to Zahdan, Odeh and Salameh owed more than they owned, rendering them insolvent. Ex. 7, at 3–22; Ex. 11; Ex. 2, at ¶¶ 30–32; Ex. 3, at ¶¶ 6–8.

---

[1] On some individual properties, the liens and exemptions exceed the total value of the property. In such cases, the "asset" value is treated as zero, not negative. The detailed list of each item of property summarized in this chart is attached as Ex. 11.

—9—

Dated: February 27, 2024          Respectfully submitted,

**Awad Odeh** and **Julia Salameh**

By: <u>/s/ Jeffrey K. Paulsen</u>
One of Their Attorneys

Jeffrey K. Paulsen (6300528)
**FACTORLAW**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
Tel: (312) 878-0969
Fax: (847) 574-8233
E-mail: jpaulsen@wfactorlaw.com

## CERTIFICATE OF SERVICE

  I, Jeffrey K. Paulsen, an attorney, certify that I served a copy of this document on each entity shown on the attached list at the address shown and by the method indicated on the list on February 27, 2024.

                     /s/ Jeffrey K. Paulsen

## SERVICE LIST

**Registrants**
(Service via ECF)

David P Lloyd on behalf of Defendant Ahmad Zahdan
courtdocs@davidlloydlaw.com

Jeffrey K. Paulsen on behalf of Plaintiff Awad Musa Odeh
jpaulsen@wfactorlaw.com, bsass@wfactorlaw.com, jpaulsen@ecf.courtdrive.com

Lars A Peterson on behalf of Plaintiff Awad Musa Odeh
lpeterson@wfactorlaw.com, bsass@wfactorlaw.com, lpeterson@wfactorlaw.com